**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **BRYAN EUGENE GARNER, #203966** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:18cv515** |
| | § | |
| **DIRECTOR, TDCJ-CID** | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

*Pro Se* Petitioner Bryan Eugene Garner, an inmate confined in the Texas prison system, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition was referred to United States Magistrate Judge Kimberly C. Priest Johnson for findings of fact, conclusions of law, and recommendations for the disposition of the case pursuant to 28 U.S.C. § 636, and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to the United States Magistrate Judge.

## I.  PROCEDURAL BACKGROUND

Petitioner is challenging his Denton County convictions, Cause No. F-2013-1344-E. On May 1, 2015, a jury found Petitioner guilty of indecency with a child and continuous sexual abuse of a young child. (Dkt. #11-29, p. 139). The jury assessed Petitioner's punishment at life for each offense, with the sentences to run consecutively, and the trial court sentenced him accordingly. (Dkt. #11-29, pp. 139-41).

Petitioner appealed his convictions, which were affirmed on August 11, 2016. *Garner v. State*, No. 02-15-00171-CR, 2016 WL 4247970 (Tex. App. Aug. 11, 2016) (Dkt. #11-5). Petitioner's motion for rehearing was denied on August 31, 2016. (Dkt. #11-3). Petitioner filed a petition for discretionary review ("PDR") (Dkt. #11-36), which the Texas Court of Criminal Appeals ("TCCA") refused on January 11, 2017. *Garner v. State*, PDR No. 1133-16.

Petitioner filed an application for state habeas corpus relief on October 9, 2017. (Dkt. #11-45, pp. 4-21). The state habeas court, without explanation, recommended relief be denied because Petitioner had not met his "burden of showing the probability of a different result in his trial absent the alleged errors of his trial counsel." (Dkt. #11-51, pp. 1, 4). The TCCA remanded the application to the state habeas court for findings of fact and conclusions of law. (Dkt. #11-52). On March 20, 2018, the state habeas court adopted the State's Proposed Supplemental Findings of Fact and Conclusions of Law and recommended Petitioner's application be denied. (Dkt. #11-44, pp. 6-16). On April 18, 2018, the TCCA denied the application without a written order on the findings of the state habeas court without a hearing. (Dkt. #11-40).

Petitioner filed the instant petition (Dkt. #1) on July 6, 2018.[1] Petitioner asserts the following claims for relief:

(1)    The prosecutor improperly vouched for the credibility of the victim-witness and "beg[ed]" the jury to find Petitioner guilty during closing argument.

(2)    Trial counsel provided ineffective assistance by (a) failing to object to the prosecutor (i) vouching for the credibility of the victim-witness and "begging" the jury to find Petitioner guilty during closing argument, and (ii) asking leading questions on direct examination; and (b) opening the door to Petitioner's prior criminal history.

(Dkt. #1, pp. 5, 7; Dkt. #1-1). The Director filed a response, arguing the claims are without merit. (Dkt. #10). Petitioner filed a reply. (Dkt. #14).

After briefing, on August 13, 2020, the Court granted Petitioner's motion to stay the case while he pursued additional state court remedies, and the case was administratively closed. (Dkt. ##18, 19). Plaintiff proceeded to file five subsequent state habeas applications (*see generally* Dkt.

---

[1] A *pro se* prisoner's habeas corpus petition is deemed filed, for the purposes of the Antiterrorism and Effective Death Penalty Act of 1996, when the prisoner delivers the papers to prison authorities for mailing. *Cousin v. Lensing*, 310 F.3d 843, 847 (5th Cir. 2002); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998). Petitioner declared under penalty of perjury that he deposited the petition in the prison mailing system on July 6, 2018. (Dkt. #1, p. 15).

#28), which the TCCA dismissed pursuant to the abuse of writ doctrine, codified at Tex. Code Crim. Proc. art. 11.07 § 4(a)-(c). (Dkt. ##28-5, 28-13, 28-18, 28-24, 28-38). When Petitioner filed his sixth subsequent application, the TCCA dismissed it (Dkt. #28-43) and entered an abuse of writ order (Dkt. #28-44) cautioning Petitioner that should he file future habeas applications in this cause, the court will not consider the merits of his applications unless he shows the factual or legal basis of his grounds was unavailable in a previously filed application. Petitioner filed another subsequent application, and the TCCA took no action on the application, explaining: "This Court has previously entered an order citing you for abuse of the writ of habeas corpus. The application for writ of habeas corpus filed by you in the 367th District Court, received by this Court on 4/13/2023, does not satisfy the requirements for consideration set out in the order described above." (Dkt. #28-50).

On July 17, 2023, Petitioner filed a motion to return the case to the active docket. (Dkt. #24). In his motion to return the case to the active docket, Petitioner raises an additional claim that there was insufficient evidence to support his convictions. (Dkt. #24, pp. 1-4). On July 19, 2023, the Court granted Petitioner's motion to return the case to the active docket. (Dkt. #25). The Director filed a supplemental response, arguing Petitioner's supplemental sufficiency of the evidence claim is procedurally barred. (Dkt. #29). Petitioner filed a supplemental reply. (Dkt. #30).

## II.  FACTUAL BACKGROUND

The Second District Court of Appeals set out a recitation of the facts as follows:

Garner is Rachel's[2] father. Garner and Michelle—Rachel's mother and Garner's wife—had their parental rights terminated when Rachel was a "very young child." After their rights were terminated, Susan—Michelle's mother and Rachel's grandmother—took custody of Rachel.

[FN2] To protect the anonymity of the victim in this case, we will use aliases to refer to some of the individuals named herein. *See* Tex.

R. App. P. 9.8 cmt., 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

Rachel testified[3] that the first time she was sexually abused by Garner she was three years old and living at Susan's house. Rachel stated that she was alone in the house with Garner when he took her clothes off and touched her "part to pee" with his "part to pee."[4] Rachel testified that she and Garner were standing up when the abuse started but that eventually she was lying on the floor with Garner on top of her going "back and forth" with "his part to pee on [her] part to pee." Garner told Rachel not to tell anyone what had happened "or else." Rachel testified that on another occasion at Susan's house she was lying on her stomach and Garner touched her "bottom" with "his part to pee." Rachel testified that Garner's body was moving "up and down" and that it "hurt." She also stated that on that occasion Garner touched her "bikini top" with his hands.

> [FN3] Rachel was eleven years old at the time of trial.

> [FN4] Rachel testified that she did not know the proper names of the male and female anatomy.

In 2009, Rachel moved out of Susan's house and began living with her grandfather, Gus, at his house.[5] Also living at Gus's house were his girlfriend, Betty, and Betty's daughter, Angie. A "couple of months" after Rachel moved into Gus's house, Garner, Michelle, and Rachel's two younger sisters—Heather and Hailey—also moved into Gus's house. Rachel testified that while at Gus's house, Garner came into her room while she was lying on the bed and touched her "part to pee" with his "part to pee." She testified that her clothes were off when this contact occurred and that Garner's pants were off. She stated that Garner "moved around" while lying on top of her and that he later turned her around and touched her "butt" with his "part to pee."[6] Garner again told Rachel not to tell anyone "or else."[7]

> [FN5] Gus is Michelle's father and Susan's ex-husband.

> [FN6] Rachel testified that contact occurred with both her "part to poop and . . . [her] bottom cheeks."

> [FN7] Rachel also recalled being sexually abused by Garner in the master bedroom of Gus's house, although she did not remember the details of the abuse.

After living together for approximately eight to nine months at Gus's house, Garner, Michelle, Heather, and Hailey moved to another house—referred to throughout the trial record as the "green-roof house" or the "green house"—that was located approximately a mile away from Gus's house. Rachel continued living at Gus's house but would often visit her parents and younger sisters at the green-roof house.[8]

[FN8] Rachel testified that the reason she went to visit the green-roof house was to "protect [her] little sisters."

Rachel stated that Garner sexually abused her on more than ten occasions at the green-roof house. She testified that on one occasion, she was playing with her younger sisters and a friend in a bedroom of the green-roof house when Garner came into the room. Rachel and the other girls hid under a bed when Garner walked in, but Garner pulled Rachel from under the bed and took her into a bathroom and closed the door. Garner then took off his pants, laid Rachel down on a bath mat, got on top of her, and "[h]is part to pee touched [Rachel's] part to pee." Rachel testified that Garner's "part to pee" went "inside" her and it hurt. She testified that on this occasion Garner also touched her "bikini top" with his hands.[9]

[FN9] Rachel testified that her clothes were off while this abuse took place.

Rachel testified that on another occasion at the green-roof house, she was alone with Garner in the kitchen when he touched her "bikini top" underneath her clothes. He then laid her down on the floor and touched her "bottom" with his hands and her "part to pee" with his "part to pee." Rachel testified that Garner also sexually abused her in the "red bedroom" of the green-roof house. She stated that Garner touched her "part to pee," "bikini top," and "bottom."[10] Rachel testified that another time she was inside a shed connected to the green-roof house when Garner touched her "bottom" with his hands and touched her "part where the poop comes out" with his "part to pee." Rachel testified that on another occasion she and Garner had just finished riding horses when he pulled down her pants and began touching her by a tree near the shed. Rachel stated that Garner touched her "bottom" with his hands and touched her "part to pee" with "his part to pee."

[FN10] It is unclear from Rachel's testimony what part or parts of Garner's body were used to make contact with the parts of her body in the "red bedroom" of the green-roof house.

Rachel also stated that Garner abused her "more than ten times" in his truck. She testified that Garner would often take her to and from the green-roof house and Susan's house and that he would use "back roads" when making the trip. Rachel described one occasion where she was in the truck with Garner and he touched her "part to pee" and "bottom" with his "part to pee." She testified that while that contact was occurring, a red truck drove by and Garner quickly put his clothes back on. She also testified that Garner kept rags in his truck and that he would wipe "white . . . liquid" from his "part to pee" and that "multiple times" he wiped the "white stuff" from her "bottom" and "part to pee."

On February 20, 2013, Garner picked Rachel up from school in his truck.[11] Rachel testified that Garner stopped the truck on a back road and touched her "bikini top"

with his hands, her "part to pee" with his "part to pee," and her "bottom" with his "part to pee." Rachel stated that they then went to pick up Angie from school and that she cried in front of Angie. Angie testified that she saw Rachel crying when she got in Garner's truck, and she asked Rachel what was wrong, but Rachel would not tell her. Angie then asked Garner why Rachel was upset, and Garner said he "didn't know." Rachel went to Garner's home afterward—the green-roof house— and Michelle noticed that Rachel was "bawling." Michelle and Angie repeatedly asked Rachel what was wrong, but Rachel would not tell them. Rachel never visited the green-roof house again.

> [FN11] Normally, Betty picked Rachel up from school. Betty asked Garner to pick Rachel up on this occasion, however, because Betty was recuperating from a surgery performed the previous day.

On May 2, 2013, Rachel and Betty traveled together to visit Betty's mother. During their car ride, Betty asked Rachel why she would not ride with Garner in his truck alone. Rachel at first did not respond, but when pressed, she indicated that Garner pulled her pants down. Betty then took Rachel back to Gus's house, and Rachel indicated to Betty and Gus that Garner had pulled her pants down. Betty then handed Rachel a doll so that she could show what Garner did to her. Rachel positioned her fingers over the doll's genital area in a "V" motion, and she said that Garner had straddled her. Gus and Betty then contacted law enforcement.

Four days later, Rachel went to the Children's Advocacy Center for a forensic interview and a sexual assault nurse examination. Lori Nelson, the program director for the Children's Advocacy Center, performed the forensic interview on Rachel. During the interview, Rachel detailed the abuse that occurred in Garner's truck, as well as the abuse that occurred at Susan's house, Gus's house, and the green-roof house. Nelson testified that Rachel gave "lots of sensory details" during the interview and that "sensory details lend credibility and reliability to [a] child's statement." Deborah Ridge conducted the sexual assault nurse examination on Rachel. Ridge noted that there was no injury to Rachel's genitalia; she testified, however, that it is normal for sexual-assault victims not to show any signs of injury to their genitalia.

*Garner*, No. 02-15-00171-CR, 2016 WL 4247970, at *1-3 (Dkt. #11-5, pp. 2-7).

### III.  STANDARD FOR FEDERAL HABEAS CORPUS RELIEF

The role of federal courts in reviewing habeas corpus petitions by prisoners in state custody is exceedingly narrow. A person seeking federal habeas corpus review must assert a violation of a federal constitutional right. *Lowery v. Collins*, 988 F.2d 1354, 1367 (5th Cir. 1993); *Malchi v. Thaler*, 211 F.3d 953, 957 (5th Cir. 2000). Federal habeas corpus relief will not issue to correct

errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005). In the course of reviewing state proceedings, a federal court does not sit as a super state appellate court. *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986).

The prospect of federal courts granting habeas corpus relief to state prisoners has been further limited by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The new provisions of § 2254(d) provide that an application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) was contrary to federal law then clearly established in the holdings of the Supreme Court; (2) involved an unreasonable application of clearly established Supreme Court precedent; or (3) was based on an unreasonable determination of the facts in light of the record before the state court. *See Harrington v. Richter*, 562 U.S. 86, 97-98 (2011).

The statutory provision requires federal courts to be deferential to habeas corpus decisions on the merits by state courts. *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). Furthermore, a state court's factual findings are entitled to deference and are presumed correct unless the petitioner rebuts those findings with clear and convincing evidence. *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010); *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006); *Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001); *see also Moore*, 313 F.3d at 881 (the statutory provision requires federal courts to be deferential to habeas corpus decisions on the merits by state courts). This deference extends not only to express findings of fact, but also to any implicit findings of the state court. *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005)). Where, as here, "the state habeas court and trial

7

court are one in the same," the presumption of correctness afforded the state habeas court's factual determinations is "especially strong." *Mays v. Stephens*, 757 F.3d 211, 214 (5th Cir. 2014) (citations omitted).

A decision by a state court is "contrary to" the Supreme Court's clearly established law if it "applies a rule that contradicts the law set forth in" the Supreme Court's cases. *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). A federal court's review of a decision based on the "unreasonable application" test should only review the "state court's 'decision' and not the written opinion explaining that decision." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas corpus court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Rather, that application must be objectively unreasonable. *Id.* at 409. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the decision. *Richter*, 562 U.S. at 87 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *see Johnson v. Williams*, 568 U.S. 289, 293 (2013) (holding there is a rebuttable presumption that the federal claim was adjudicated on the merits when the state court addresses some claims, but not others, in its opinion).

"In Texas writ jurisprudence, usually a denial of relief rather than a 'dismissal' of the claim by the Court of Criminal Appeals disposes of the merits of a claim." *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *see also Henderson v. Cockrell,* 333 F.3d 592, 598 (5th Cir. 2003);

*Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (holding a "denial" signifies an adjudication on the merits while a "dismissal" means the claim was declined on grounds other than the merits). Thus, a state application that is denied without written order by the TCCA, as in the present case, is an adjudication on the merits. *See Singleton*, 178 F.3d at 384; *Ex parte Torres*, 943 S.W.2d at 472. Where the decision is a summary denial or affirmance, however, a "federal [habeas] court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning."[2] *Wilson v. Sellers*, 584 U.S. ___, ___, 138 S. Ct. 1188, 1192 (2018).

In addition to the standard of review imposed by the AEDPA, the petitioner must also show that any constitutional error had a "substantial and injurious effect or influence" on the verdict to be entitled to habeas relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The Supreme Court explained that, while the passage of the AEDPA "announced certain new conditions to [habeas] relief," it did not supersede or replace the harmless error standard announced in *Brecht*. *Brown v. Davenport*, 596 U.S. 118, 134 (2022). In other words, a habeas petitioner must also satisfy *Brecht*, even if the AEDPA applies. *See id.* ("[A] federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests.") (emphasis in original).

Additionally, federal habeas relief is foreclosed if a claim: (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S.

---

[2] The Director may rebut this presumption by showing that the most recent state court's unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were argued or supported by the record that the state court reviewed. *See Wilson*, 584 U.S. at ___, 138 S. Ct. at 1192; *Wesson v. Dir., TDCJ-CID*, No. 1:19-CV-00187-H, 2022 WL 3928513, at *3 (N.D. Tex. Aug. 30, 2022), *appeal dismissed sub nom. Wesson v. Lumpkin*, No. 22-10990, 2023 WL 2881423 (5th Cir. Mar. 10, 2023).

722 (1991); or (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989).

Thus, the federal writ serves as a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102.

## IV.  ANALYSIS

### A.  Procedural Default (Sufficiency of the Evidence)

The Director argues Petitioner's supplemental sufficiency of the evidence claim is procedurally barred from federal habeas review. (Dkt. #29, pp. 2-4). The Court agrees.

Petitioner's supplemental sufficiency of the evidence claim was not raised in his initial state habeas application; rather, Petitioner raised the argument in his subsequent state habeas applications, which were dismissed as barred by the Texas abuse of writ doctrine under article 11.07, § 4. Under the procedural default doctrine, federal courts are precluded from granting habeas relief where the last state court to consider the claims raised by the petitioner expressly and unambiguously based its denial of relief on an independent and adequate state law procedural ground. *Coleman*, 501 U.S. at 729-30; *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999). The Fifth Circuit has ruled that the Texas courts' application of the abuse of writ doctrine, codified in Tex. Code. Crim. Pro. art. 11.07, § 4, is an adequate, independent state ground barring federal habeas review. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995). The procedural bar may be overcome by demonstrating either cause and prejudice for the default or that a fundamental miscarriage of justice would result from the court's refusal to consider the claim. *Id.* Petitioner has

failed to do so. Consequently, Petitioner's supplemental sufficiency of the evidence claim is procedurally barred.

## B. **Improper Closing Argument (Ground One)**

In Ground One, Petitioner argues the prosecutor improperly vouched for the credibility of the victim-witness and "beg[ed] and ("cr[ied]) for the jury to find Petitioner guilty" during closing argument. (Dkt. #1, p. 5; Dkt. #1-1, pp. 10-17).

When a federal habeas petitioner alleges prosecutorial misconduct in a state criminal trial, the court must determine whether the alleged impropriety "so infected the . . . trial with unfairness as to make the result[ ] a denial of due process." *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000). A petitioner's trial is rendered fundamentally unfair only if, in the context of the entire trial, the remarks by the prosecutor were "crucial, critical, highly significant" factors. *Ortega v. McCotter*, 808 F.2d 406, 411 (5th Cir. 1987). A petitioner has the burden of showing that the evidence against him was so insubstantial that, but for the prosecutor's remarks, he would not have been convicted. *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002). A defect of constitutional proportions is not to be found except in the most egregious circumstances. *Ortega*, 808 F.2d at 410.

Under Texas law, it is generally improper for a prosecutor to vouch for the credibility of a witness during closing argument. *Carter v. State*, 650 S.W.2d 843, 847 (Tex. App. 1982). However, "if defense counsel attacks a witness's credibility, it is permissible for the prosecutor to 'stick up' for its witness in answer to the defense argument." *Weinberger v. State*, 2011 WL 652847, at *6 (Tex. App. 2011). Furthermore, under Texas law, the Texas Court of Criminal Appeals has repeatedly held that the following areas are proper for argument: (1) summary of the evidence, (2) reasonable deductions from the evidence, (3) responses to opposing counsel's

argument, and (3) pleas for law enforcement. *Borjan v. State*, 787 S.W.2d 53, 55 (Tex. Crim. App. 1990); *Allridge v. State*, 762 S.W.2d 146, 155 (Tex. Crim. App. 1988). The Fifth Circuit has recognized that these four areas are acceptable under Texas law. *Buxton v. Collins*, 925 F.2d 816, 825 (5th Cir. 1991).

Petitioner objects to the following closing argument as improper:

- And now you've got the job—you've got the important job of going back there and finding that man guilty of exactly what he's been charged with. It's an important job. (Dkt. #11-11, p. 32).

- But the State has indicted him for indecency with a child for touching [the victim's] breasts because we know that he did that. And the State is asking you to hold him responsible for all of the inappropriate contact that he had with her. Because you know that he was touching her sexual organ with his penis. You know that he flipped her over and touched her bottom, touched her anus with his penis. But because that conduct is excluded from continuous, the State says let's find him responsible for all of it. . . . And so the State is asking you to find him guilty of indecency with a child because he's guilty.

  And I know we didn't bring you 10 or 15 counts of indecency, it's the one, but I'm asking you to hold him responsible for that conduct because he's guilty of that conduct, okay? (Dkt. #11-11, p. 34).

- So you don't have to consider whether it could have happened after—you know that if you believe that conduct occurred, which it did, that it did occur before his indictment, okay? (Dkt. #11-11, p. 35).

- And if you recall back to the video yesterday, Don Britt said, well, gosh, that's over 300 chances you had with her. Let that sink in for a minute. The State has to prove two or more in 30 days or more, and that man had over 300 chances alone with her, and that's only if it's just once a week. What if he picked her up and dropped her off in that week? Think about what that little girl endured. (Dkt. #11-11, p. 35).

- You might believe, sir, that it was two, and you might believe that it was a different two. All you have to find under the law is two, and you know that the man had over 300 chances. (Dkt. #11-11, p. 36).

- September 1, 2007, all the way up to June 28th, again, the presentment date of the indictment. And you got way more than two times, okay? And I'm going to ask you to hold him responsible because he's guilty of both of them. (Dkt. #11-11, pp. 36-37).

- Think about what the 9-year-old said. That 9-year-old had no reason to lie. And he said it himself on the video: My daughter is not a liar. He said it himself. (Dkt. #11-11, p. 39).

- [The victim] had no reason to lie. . . . She told the truth during that SANE. (Dkt. #11-11, p. 39).

- There was a big deal about, well, gosh, you didn't mention that he put it in your bottom. Well, the SANE was the same day. They didn't coach her to make her story better. (Dkt. #11-11, p. 39).

- That child was telling you the truth. . . . It was this baby that went through it, this baby that had no reason to lie, the baby that he said himself, she's not a liar. This little girl. She had no reason to lie. She had—she had no reason to keep this up, no reason to come in here and tell you things that weren't true. She told you exactly the truth. (Dkt. #11-11, p. 40).

- That child isn't some mastermind making this up.

  She went through this, and I'm begging you, I'm asking you, don't forget that tiny little girl. Don't forget her when you go back there. She didn't make this up. . . . And I'm asking you, I'm begging you to hold him responsible for exactly what he's been charged with. (Dkt. #11-11, p. 41).

- Does it make sense that a father would abuse his daughter for six years? Doesn't make sense to me. But that's exactly what happened.

  . . . . For six years, all the time, every time they were alone, he was abusing her over and over again. So excuse her if she forgets one time and she has to recall all of those memories and she has to say, I'm sorry, excuse me, I got that wrong. Let me say, it was this time or it was this time. I'm sorry. That wasn't right. This is the last time.

  Does that mean she's making this up? Absolutely not. She sat there for one hour and talked to a stranger about her father pulling off his pants, pulling off her pants, taking out his penis with a devil on it, putting it against her vagina and moving it back and forth, flipping her over and putting it against her bottom and moving it back and forth, pulling up her shirt. (Dkt. #11-11, p. 50) (rebuttal closing argument).

- Was she inconsistent about a couple of things? Not really. She just had to get it straight in her mind. She was telling the truth. She told the truth then. She told the truth today—or when she testified. (Dkt. #11-11, p. 51) (rebuttal closing argument).

13

- And because I wasn't there in the morning for breakfast, he made pancakes and
  he said *(crying)*—and he threatened her for six years. . . . Think about her. She's
  telling the truth. No child could be fed that amount of detail, and she said to you
  over and over: It was him who did it.

  I am asking you to end her nightmare, and I'm asking you to go back there and
  find him guilty of both counts. (Dkt. #11-11, pp. 55-56) (rebuttal closing
  argument).

(*See* Dkt. #1-1, pp. 10-13).

The state habeas court found and concluded "[t]he complained-of statements made by the
prosecutor during closing argument . . . were reasonable deductions from the evidence." (Dkt. #11-
44, p. 9, ¶ 11, p. 11, ¶ 6, p. 15). The TCCA subsequently denied relief without a written order
based on the findings of the state habeas court, which constitutes an adjudication on the merits.
*See Singleton*, 178 F.3d at 384.

Petitioner fails to rebut the presumption of correctness to which the state findings are
entitled. *Valdez*, 274 F.3d at 947. Every argument Petitioner complains about falls into specifically
allowable areas of argument recognized by the TCCA. Petitioner cherry picks the prosecutor's
statements and characterizes them as vouching for the credibility of a witness. Review of the
prosecutor's statements in the context of the entire closing argument, however, demonstrates the
prosecutor was drawing reasonable inferences from the evidence, responding to defense counsel's
attack on the victim's credibility, and making pleas for law enforcement, which the TCCA has
recognized as proper areas for closing argument. For example, Petitioner quotes the sentence,
"That child isn't some mastermind making this up"; however, this statement was made after
summation of the evidence presented to the jury:

Go back and look at these. Go back and look at those maps. The maps that you saw
yesterday, why did you get those maps? Because that little girl wasn't some
mastermind saying all these roads lead back to [Gus and Betty's]. It's a loop, folks.
It's a big loop. He goes out of his way. He takes his five, ten minutes, be still or
else. Pull down your pants or else. He gets his jollies off with a baby? And then

he's done and he takes her back. That's why you have that map. That child isn't some mastermind making this up.

(Dkt. #11-11, p. 41). In addition, the prosecutor's "begging" that the jury find Petitioner guilty was an appropriate plea for law enforcement. Furthermore, under Texas law, the prosecutor was allowed to "stick up" for the victim in his rebuttal closing argument because defense counsel attacked her credibility. *See Weinberger*, 2011 WL 652847, at \*6. Moreover, Petitioner has not shown that the evidence against him was so insubstantial that, but for the prosecutor's remarks, he would not have been convicted. *Harris*, 313 F.3d at 245.

Petitioner is not entitled to relief because he has not shown that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Williams*, 529 U.S. at 402-03; *Childress v. Johnson*, 103 F.3d 1221, 1224-25 (5th Cir. 1997). Thus, Petitioner is not entitled to relief on Ground One, and the claim should be denied.

## C.  Ineffective Assistance of Counsel Claims (Ground Two)

Petitioner's remaining habeas claims concern allegations of ineffective assistance of counsel. A petitioner who seeks to overturn his conviction on the grounds of ineffective assistance of counsel must prove entitlement to relief by a preponderance of the evidence. *James v. Cain*, 56 F.3d 662, 667 (5th Cir. 1995). Ineffective assistance of counsel claims are governed by the Supreme Court's standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* provides a two-pronged standard, and the petitioner bears the burden of proving both prongs. *Id.* at 687.

Under the first *Strickland* prong, the petitioner must show counsel's performance was deficient. *Id.* To establish deficient performance, he must show "counsel's representation fell below an objective standard of reasonableness," with reasonableness examined under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688. The *Strickland* court further explained:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight . . . .

*Id.* at 689 (citations omitted). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted).

Under the second prong of the *Strickland* test, the petitioner must show his attorney's deficient performance resulted in prejudice. *Id.* at 687. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either. *Id.* at 697.

In addition to applying the *Strickland* two-prong test, a federal habeas court must review a state petitioner's ineffective assistance of counsel claim "through the deferential lens of [28

U.S.C.] § 2254(d)." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). Reviewing Petitioner's

ineffective assistance of counsel claim through the lens of the AEDPA means that he has a higher

bar to exceed in order to prevail. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla*

*v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland*

was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by

*Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review

is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). Moreover, unreasonableness under

*Strickland* and under § 2254(d) are not the same. First, "[t]he *Strickland* standard is a general one,

so the range of reasonable applications is substantial." *Id.* Second, "[w]hen § 2254(d) applies, the

question is not whether counsel's actions were reasonable. The question is whether there is any

reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* The Court must

consider not only whether the state court's determination was incorrect, but also "whether that

determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556

U.S. 111, 123 (2009) (citing *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Thus, in light of the

deference accorded by § 2254(d), "[t]he pivotal question is whether the state court's application

of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101.

Furthermore, a petitioner's allegations of ineffective assistance of counsel must be

supported by the record. *United States v. Johnson*, 679 F.2d 54, 58-59 (5th Cir. 1982). Even when

liberally construing *pro se* pleadings, "mere conclusory allegations on a critical issue . . . are

insufficient to raise a constitutional issue." *Black v. Davis*, 902 F.3d 541, 547 (5th Cir. 2018)

(citation omitted). More specifically, conclusory statements are insufficient to sustain a claim of

ineffectiveness. *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001); *see also Green v.*

*Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue.").

### 1. Failure to Object

Petitioner asserts trial counsel was ineffective for failing to object to the prosecutor: (a) vouching for the credibility of the victim-witness and "begging" the jury to find Petitioner guilty during direct examination; and (b) asking leading questions during direct examination. (Dkt. #1, p. 7; Dkt. #1-1, pp. 18-22).

A failure to object does not constitute deficient representation unless a sound basis exists for objection. *See Roberts v. Thaler*, 681 F.3d 597, 611 (5th Cir. 2012) ("[C]ounsel is not required to make futile motions or objections." (quoting *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990)); *Green*, 160 F.3d at 1037 (failure to make frivolous objections does not cause counsel's performance to fall below an objective level of reasonableness); *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997) (a futile or meritless objection cannot be grounds for a finding of deficient performance); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."). Even with a sound basis, however, an attorney may render effective assistance despite a failure to object when the failure is a matter of trial strategy. *See Burnett v. Collins*, 982 F.2d 922, 930 (5th Cir. 1993) (noting a failure to object may be a matter of trial strategy as to which courts will not second guess counsel). Indeed, the Fifth Circuit has "recognized that deciding whether to object before a jury is a quintessential matter of trial strategy not to be second-guessed." *Thomas v. Thaler*, 520 Fed. Appx. 276, 281 (5th Cir. 2013). Furthermore, a determination of ineffectiveness depends on whether an objection would have been sustained had it been made. *United States v. Oakley*, 827 F.2d 1023, 1025 (5th Cir. 1987).

### a. Improper closing argument

Petitioner asserts trial counsel was ineffective for failing to object to the prosecutor vouching for the credibility of the victim-witness and "begging" the jury to find Petitioner guilty during closing argument. (Dkt. #1, p. 7; Dkt. #1-1, pp. 18-20, 22).

This claim was fully developed during the state habeas corpus proceeding. In his affidavit submitted in response to Petitioner's state habeas application, trial counsel explained he did not object to the complained-of-statements made by the prosecutor during closing argument because the prosecutor's argument "was a reasonable deduction from evidence and, therefore, was not subject to objection." (Dkt. #11-44, p. 4). After finding trial counsel's affidavit credible (Dkt. #11-44, p. 7, ¶ 5), the state habeas court found "[t]he complained-of statements made by the prosecutor during closing argument to which Applicant claims his counsel should have objected were reasonable deductions from the evidence, and trial counsel made the strategic decision not to object to them given that such objections would have been fruitless." (Dkt. #11-44, p. 9, ¶ 11, p. 15). The state habeas court then made the following conclusions:

> 6.     Applicant's trial counsel was not ineffective for failing to object to certain parts of the State's closing argument, given that such objections would not have been sustainable as they were reasonable deductions from the evidence, and it was a justifiable trial strategy not to draw attention to ancillary matters and focus solely on Applicant's defense. Counsel cannot be ineffective for failing to raise futile objections in any event. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002); *Ex parte Martinez*, 195 S.W.3d 713, 721 (Tex. Crim. App. 2006).
>
> . . . .
>
> 9.     Applicant has not met his burden of showing the probability of a different result in his trial absent the alleged errors of his trial counsel. *Washington v. State*, 111 S.W.2d 537, 545 (Tex. Crim. App. 1989), *cert. denied*, 492 U.S. 912.
>
> 10.     Applicant's trial counsel was not ineffective. *See Strickland v. Washington*, 466 U.S. at 687, 700 (1973).

(Dkt. #11-44, pp. 11, 12, 15). The TCCA subsequently denied relief without a written order based on the findings of the state habeas court, which constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

As discussed in Section IV.B *supra*, review of the prosecutor's complained-of statements in the context of the entire closing argument demonstrates the prosecutor was drawing reasonable inferences from the evidence, responding to defense counsel's attack on the victim's credibility, and making pleas for law enforcement, all of which the TCCA has recognized as proper areas for closing argument. Thus, any objection on the basis of improper closing argument would have been without merit. Trial counsel's failure to make a meritless objection does not constitute deficient performance. *See Green*, 160 F.3d at 1037; *Emery*, 139 F.3d at 198; *Clark*, 19 F.3d at 966. Furthermore, even assuming the prosecutor's closing argument was improper, Petitioner has not shown that he was prejudiced by trial counsel's failure to object to the prosecutor's closing argument. Indeed, Petitioner has not shown that the evidence against him was so insubstantial that, but for the prosecutor's remarks, he would not have been convicted. *Harris*, 313 F.3d at 245. Having not shown deficient performance or prejudice, the state court's denial of this claim was not contrary to, or an unreasonable application of, *Strickland*. Petitioner has failed to show there was no reasonable basis for the state court to deny relief. *Richter*, 562 U.S. at 98. Therefore, Petitioner is not entitled to relief on this ground and the claim should be denied.

b. *Leading questions*

Petitioner also contends trial counsel provided ineffective assistance by failing to object to the prosecutor asking the investigator leading questions on direct examination. (Dkt. #1, p. 7; Dkt. #1-1, pp. 21-22).

The Fifth Circuit has held the "failure to object to leading questions and the like is generally a matter of trial strategy as to which [this court] will not second guess counsel." *Villanueva v. Stephens*, 555 Fed. App'x 300, 307 (5th Cir. 2014) (quoting *Burnett*, 982 F.2d at 930).

Petitioner asserts trial counsel was ineffective for failing to object to the prosecutor's following questions during direct examination of the investigator:

> Q. Did you have more than probable cause to believe that Bryan Garner had committed this offense?
>
> A. Yes.
>
> Q. At this point, did you believe beyond a reasonable doubt that he had committed this offense against [the victim]?
>
> A. Yes.

(Dkt. #11-10, pp. 207-08). The investigator then testified Petitioner was arrested. (Dkt. #11-10, p. 208).

This claim was fully developed during the state habeas corpus proceeding. Trial counsel averred he did not object to the leading questions identified by Petitioner because he believed "if you continue to make objections to testimony in evidence that is not harmful to the case it is not liked by the jury and leads them to believe that you are hiding something." (Dkt. #11-44, p. 4). After finding trial counsel's affidavit credible (Dkt. #11-44, p. 7, ¶ 5), the state habeas court found as follows:

> 9.    Trial counsel did not object to certain leading questions because he believed that too many objections would be harmful to Applicant's case and would have led the jury to believe Applicant was hiding something. This was especially true in the context of this case in which Applicant's defense was denial, and where the questions could have simply been asked another way.

(Dkt. #11-44, pp. 8, 15). The state habeas court then made the following conclusions:

> 4.    Applicant's trial counsel was not ineffective for failing to object to certain leading questions, as counsel made a proper strategic decision that excessive

21

objections would be fruitless and indeed could possibly be harmful to Applicant's case. *See Carey v. State*, No. 06-07-00066-CR, 2007 Tex. App. LEXIS 9052, *13-*14 (Tex. App.—Texarkana Oct. 18, 2007, no. pet.) (sound trial strategy not to object to leading questions).

. . . .

9.    Applicant has not met his burden of showing the probability of a different result in his trial absent the alleged errors of his trial counsel. *Washington v. State*, 111 S.W.2d 537, 545 (Tex. Crim. App. 1989), *cert. denied*, 492 U.S. 912.

10.    Applicant's trial counsel was not ineffective. *See Strickland v. Washington*, 466 U.S. at 687, 700 (1973).

(Dkt. #11-44, pp. 10-11, 12, 15). The TCCA subsequently denied relief without a written order based on the findings of the state habeas court, which constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has not shown the state habeas court unreasonably applied *Strickland* to the facts before it. The state court reasonably concluded trial counsel's decision not to object to leading questions was reasonable trial strategy. Based on trial counsel's experience, he determined that had he objected to every possible leading question—especially inconsequential or innocuous testimony—the jury could look unfavorably at the defense and surmise Petitioner was trying to hide something. Furthermore, the trial judge likely would have instructed the prosecutor to rephrase the question, which the prosecutor presumably would have done. Moreover, Petitioner has not shown that he was prejudiced by trial counsel's failure to object to leading questions. *See Rushing v. Butler*, 868 F.2d 800, 806 (5th Cir. 1989) (dismissing claim concerning failure to object to leading questions because "even if we were to surmise that defense counsel's performance was, in fact, deficient . . . [the petitioner]'s claims of ineffective assistance of counsel must fail under the prejudice prong of the *Strickland* analysis"). Indeed, because the Petitioner was on trial, the jury necessarily knew he had been arrested in the case before them. Having not shown deficient

22

performance or prejudice, the state court's denial of this claim was not contrary to, or an unreasonable application of, *Strickland*. Therefore, Petitioner is not entitled to habeas relief on this claim, and it should be denied.

### 2. Opening the Door

Petitioner also asserts trial counsel provided ineffective assistance by opening the door to Petitioner's prior criminal history. (Dkt. #1, p. 7; Dkt. #1-1, pp. 21).

This claim was fully developed during the state habeas corpus proceeding. In his affidavit filed in response to Petitioner's state habeas application, trial counsel addressed the claim as follows:

> The defense in this case was that the evidence was manufactured by the grandparents because defendant's wife's father did not like the defendant based on his actions and background. The information was introduced to inform the jury that although not a reason to make up allegations to show there was a dislike on behalf of the grandparents and that it had been ongoing for some time.

(Dkt. #11-44, p. 5). The state habeas court made the following finding:

> 12.    Applicant's trial counsel made the strategic decision to allow evidence regarding Applicant's past criminal history into evidence because Applicant's entire defense revolved around his claim that the grandparents of the victim disliked Applicant and wanted to see Applicant in prison. The evidence that Applicant had been in a domestic dispute with his wife and that the victim's grandfather intervened was necessarily part of Applicant's defense.

(Dkt. #11-44, pp. 9, 15). The state habeas court then made the following conclusions:

> 7.    Applicant's trial counsel was not ineffective for allowing evidence to come in about prior extraneous offenses and bad acts of appellant, as such evidence was part of what was necessary to establish Applicant's defensive theory about the victim's grandparents being hostile to him and wanting him to go to prison. *See, e.g.*, *Williams v. State*, 301 SW.3d 675, 687 (Tex. Crim. App. 2009) (trial counsel not ineffective for opening door to extraneous offenses where reason for doing so was to point out bias against defendant by the witnesses).
>
> . . . .

9.    Applicant has not met his burden of showing the probability of a different result in his trial absent the alleged errors of his trial counsel. *Washington v. State*, 111 S.W.2d 537, 545 (Tex. Crim. App. 1989), *cert. denied*, 492 U.S. 912.

10.    Applicant's trial counsel was not ineffective. *See Strickland v. Washington*, 466 U.S. at 687, 700 (1973).

(Dkt. #11-44, pp. 12, 15). The TCCA subsequently denied relief without a written order based on the findings of the state habeas court, which constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner fails to show the state court's determination that trial counsel employed a reasonable trial strategy in opening the door to Petitioner's criminal history was contrary to, or an unreasonable application of, *Strickland*. Although that strategy ultimately allowed the introduction of Petitioner's criminal history, which Petitioner claims was prejudicial, the Court must make every effort "to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Trial counsel attempted to create a narrative where the victim's grandparents were hostile towards Petitioner and wanted to see him in prison. Although in hindsight trial counsel might employ a different strategy, it was objectively reasonable at the time taken. Furthermore, Petitioner cannot show he was prejudiced by the defensive theory. The jury received the following limiting instruction as to testimony about extraneous bad acts:

You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offenses alleged against him in the indictment in this case, you cannot consider said testimony for any other purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the intent of the defendant, the state of mind of the defendant and child, or the previous and subsequent relationship between the defendant and the child, if any, in connection with the offenses, if any, alleged against him in the indictment in this case, and for no other purpose.

(Dkt. #11-29, p. 119). Juries are presumed to follow the law. *Woodward v. Epps*, 580 F.3d 318, 330 (5th Cir. 2009). Petitioner does not allege, nor show, the testimony was used by the jury for

any improper purpose. Thus, even assuming, *arguendo*, trial counsel was deficient, the state court's determination that Petitioner was not prejudiced by trial counsel's performance is not unreasonable. Having not shown deficient performance or prejudice, the state court's denial of this claim was not contrary to, or an unreasonable application of, *Strickland*. Petitioner has failed to show there was no reasonable basis for the state court to deny relief. *Richter*, 562 U.S. at 98. Therefore, Petitioner is not entitled to habeas relief on this claim, and it should be denied.

## V.  CONCLUSION

Petitioner has failed to show he is entitled to habeas relief. Petitioner's supplemental sufficiency of the evidence claim is procedurally barred, and his original claims are without merit. Petitioner has failed to demonstrate the prosecutor's closing argument was improper or that the evidence against him was so insubstantial that, but for the prosecutor's remarks, he would not have been convicted. Petitioner also has failed to demonstrate trial counsel rendered ineffective assistance under *Strickland*. Above all, Petitioner has failed to show that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *Williams*, 529 U.S. at 402-03, 405-06; *Childress*, 103 F.3d at 1224-25. Petitioner has not shown there was no reasonable basis for the state court to deny relief. *Richter*, 562 U.S. at 98. Accordingly, Petitioner's habeas petition should be denied and dismissed.

## VI.  CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the Court of Appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B). Although Petitioner has not yet filed a notice of appeal, it is respectfully

25

recommended that the Court, nonetheless, address whether Petitioner would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (holding a district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court," noting "[f]urther briefing and argument on the very issues the court has just ruled on would be repetitious").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a substantial showing of the denial of a constitutional right in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). When a district court denies a motion on procedural grounds without reaching the underlying constitutional claim, a certificate of appealability should issue when the petitioner shows, at least, jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.*

In this case, it is respectfully recommended reasonable jurists could not debate the denial of Petitioner's § 2254 petition on substantive or procedural grounds, nor find the issues presented are adequate to deserve encouragement to proceed. *See Miller-El v. Cockrell*, 537 U.S. 322, 336-37 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, it is respectfully recommended the Court find Petitioner is not entitled to a certificate of appealability.

## VII.  RECOMMENDATION

It is recommended the above-styled petition filed under 28 U.S.C. § 2254 be denied and the case be dismissed with prejudice. It is further recommended a certificate of appealability be denied.

Within fourteen days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(c). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*), *superceded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**So ORDERED and SIGNED this 18th day of March, 2024.**

KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE

27